IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | | |
|---|---|---|
| KYLE WALLACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:18-CV-25 |
| | ) | |
| COFFEE COUNTY, TENNESSEE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This civil action is before the Court for consideration of Defendant's motion for summary judgment [doc. 23]. Plaintiff has responded [doc. 28], and Defendant has replied [doc. 29]. Oral argument is unnecessary, and the motion is ripe for the court's determination. For the reasons that follow, the motion [doc. 23] will be granted and this case will be dismissed

### I.  BACKGROUND

#### a.  Complaint

In his complaint, Plaintiff alleges that, in April and May of 2017, he was a pretrial detainee at the Coffee County Jail. [Doc. 1 at 1]. On April 23, 2017, a mentally-ill inmate named "Prior"[1] began purposefully flooding his cell with toilet water after urinating and defecating. [*Id*. at 2]. As a result, wastewater poured into Plaintiff's nearby cell and

---

[1] Later documents identify the inmate as David Pryor, and the Court will refer to him as "Pryor" through this memorandum opinion.

covered his cell floor by a depth of multiple inches. The wastewater remained in Plaintiff's cell and would not subside, contaminating his cell, belongings, bedsheets, clothing, and person. The evening of April 23, Plaintiff requested to mop his cell, wash himself, and disinfect his cell, but his request was denied. Pyror was not punished for flooding the cell, but all other inmates in the pod were punished by denial of access to showers and confinement to their cells. [*Id.*]. The contaminated water remained in Plaintiff's cell for over 24 hours, until the next incident. [*Id.* at 3].

The next night, on April 24, 2017, Pryor began urinating and defecating in his cell, then activated the sprinkler system. [*Id.*]. Plaintiff's cell again flooded with wastewater multiple inches deep, which would not subside, and again contaminated his cell, belongings, bedsheets, clothing, and person. This caused Plaintiff severe anxiety and apprehension, especially because Pryor was known to be "physically diseased." Before midnight on April 24, the guards allowed Pryor to take a shower, but did not clean his cell, and left feces smeared on the walls and door all night. [*Id.*]. During the early morning hours of April 25, Plaintiff again asked for an opportunity to shower, mop, and clean his cell. [*Id.* at 3-4]. This request was denied because the entire pod was under lockdown as punishment. [*Id.* at 4].

After remaining in his wastewater-filled cell for approximately two days, the guards finally drained the water on April 25. [*Id.*]. Plaintiff was allowed to shower at the end of the day on April 25. However, he was still not allowed to clean his cell, which continued to smell of urine and feces, despite repeatedly requesting cleaning materials. After this incident, beginning on April 26, Plaintiff became physically ill for several days. [*Id.*]. On

2

May 3, during recreation time, Plaintiff demanded cleaning supplies from the guards, who denied his request, but later relented, and provided him with some cleaning supplies, after Captain Rick Gentry[2] stated that Plaintiff's cell smelled of urine and feces. [*Id*. at 5]. Plaintiff alleges that, after these incidents, a pattern emerged during May of inmates flooding wastewater in their cells, which affected Plaintiff. [*Id*.]. During all of these incidents, he was never allowed to get a clean bedsheet. [*Id*. at 5-6].

Plaintiff brings one count under 42 U.S.C. § 1983, alleging a violation of his right to be free from punishment without due process of law, which he also labels as a "deliberate indifference" claim. [*Id*. at 6]. Plaintiff states that Defendant is responsible for this violation for three reasons: (1) County officials were made aware of the violation and ratified it; (2) the County had a custom of refusing to take individual action against inmates who threaten or harm others and collectively punishing inmates by, *inter alia*, denying showers and disabling water supplies; and (3) the Sheriff's deputies were inadequately trained to provide for health and sanitation in living areas. [*Id*. at 6-7].

### b. Summary Judgment Evidence

In his declaration, Captain Gentry stated that he was the correctional division administrator for the Coffee County Sheriff's Office and oversaw the operations of the Coffee County Jail. [Doc. 23-1 at 1]. He stated that grievances, maintenance requests, and medical requests are filed by inmates on the Jail's kiosk system, which maintains all

---

[2] Some documents refer to Gentry as "Captain," while others refer top him as "Lieutenant." For the sake of consistency, the Court will refer to Gentry as "Captain Gentry" throughout this memorandum opinion.

requests, and provides no way for anyone at the jail to delete or manipulate the entries. [*Id.*]. Captain Gentry searched the records for any incident reports, grievances, or request related to the claims in the complaint, and found no incident reports from May 2017 indicating that an inmate caused water to flood Plaintiff's cell. [*Id.* at 1-2]. Captain Gentry stated that the Jail is cleaned on a daily basis, the Shift Supervisor inspects the Jail on each shift for cleanliness, and inmates are given daily access to cleaning supplies and are responsible for cleaning their own cells. [*Id.* at 2]. Each cell has a sprinkler head, and sometimes inmates "flood" their cells by tampering with the sprinkler heads in their cell. [*Id.* at 2-3]. When this happens, the sprinkler head is capped until it can be repaired, and the offending inmate is moved to another cell. [*Id.* at 3]. Inmates are kept in their cells during flooding in the pod to prevent the spreading of water until it has been cleaned. As soon as reasonably possible after a flood, prison officials remove inmates from their cells, shut off the water from its source, mop, dry, and clean the affected areas. Officers are trained on how to clean flooding, including water that contains contaminates, which includes issuing cleaning gear to inmates and assigning inmates to clean common areas. [*Id.*].

Captain Gentry stated that Plaintiff was housed at the Jail from November 2016 to May 2019. [*Id.*]. The pod in which Plaintiff was housed had two stories, with a bank of cells upstairs, a bank of cells downstairs, and an observational cell (BB114) that stood alone across the pod from the other cells. The center of the pod was a large open area which had three large drains. Captain Gentry stated that Plaintiff alleges that the water came from cell BB114, while Plaintiff was housed in cell BB104, and these cells were

4

separated by a distance of at least 48 feet and 9 inches, with a space between the floor and the cell door of less than 1/2 of an inch. [*Id*. at 3-4]. Thus, in order for the incident to have occurred as alleged, water would have had to travel this distance, over drains, which were lower than the floor of Plaintiff's cell, and accumulate in Plaintiff's cell. [*Id*. at 4].

Captain Gentry stated that he was not aware of any deputy that denied Plaintiff access to cleaning supplies or a shower after the incidents described in the complaint. [*Id*.]. He was not involved in any decision to deny Plaintiff cleaning supplies. Further, to the extent that Plaintiff was kept in his cell following flooding, Captain Gentry stated that this was not punishment, but rather, done to limit inmate exposure to potential contamination. Captain Gentry stated that Plaintiff's jail file indicates that he filed five grievances regarding flooding, all of which were responded to in a timely manner, and Plaintiff was informed that the guards were working on cleaning the cells. Plaintiff also filed one medical request which mentions the flooding, which was also responded to in a timely manner. [*Id*.]. Captain Gentry stated that Jail records show that inmate Pryor was disciplined for damaging the sprinkler head in his cell, receiving a disciplinary write-up and loss of privileges. [*Id*. at 5].

In his deposition, Plaintiff testified that he was housed in cell BB104, and inmate Pryor was housed in cell BB114. [Doc. 23-2 at 2]. He estimated that the space between these cells was approximately 25 to 30 feet. [*Id*.]. Plaintiff stated that the first flooding incident started when the pod was locked down, after another inmate broke the phone, and inmate Pryor was upset that he was not allowed out of his cell for recreation time. [*Id*. at 3]. As a result, Pryor urinated and defecated in the toilet in his cell and flooded the unit

5

with the toilet. Plaintiff called the guards and they stated that they were dealing with the situation, but never did anything. [*Id*. at 3-4]. Plaintiff stated that it took approximately 10 minutes for water to make it to his cell, which was closed. [*Id*. at 3]. Nothing was on the floor to get wet at that time. [*Id*. at 4]. Plaintiff stayed on his top bunk for a while, but eventually climbed down to call for the guards and ask if he could clean his cell. At that time, the water was approximately a half-inch to an inch deep, and it remained in his cell for 75 to 78 hours. [*Id*.].

For the first 48 hours, the water remained an inch-and-a-half to two inches deep, and then began receding somewhat, but there was still standing water 75 to 78 hours later. [*Id*. at 10]. During that time, he called for the guards multiple times, and their response was that, per Captain Gentry, the cells doors were not to be opened, and no showers or recreation time were allowed. [*Id*. at 4]. The water was also pooled in the center of the pod, and during this 75-to-78-hour period, the guards were walking through the water to bring meals to the inmates. After about 78 hours, the guards allowed another inmate to clean the contaminated water from the shower, and the guards brought a Shop Vac in to clean up the standing water. [*Id*.].

Plaintiff stated that his feet were soaked with the water and his legs got wet from walking in it. [*Id*.]. The water also got in his bunk and bedding because he had to walk through the water to get to his food or use the bathroom, and then would lay down in his bunk. Additionally, the water got on the table and stool for eating, because he used those items to climb into his bunk. [*Id*.]. Plaintiff stated that he could see the urine and feces in his cell. [*Id*. at 4-5]. After approximately 75 to 78 hours, Plaintiff was allowed to come

out of his cell and clean up with a squeegee and mop, but was not provided disinfectant, bleach, or spray cleaner. [*Id*. at 5]. Plaintiff ultimately created an incident where he threatened to not return to his cell after recreation time if the guards did not bring him cleaning supplies. [*Id*.]. When he was still not given cleaning supplies, Plaintiff filled his shower tote with water and poured it underneath the door to the guards' area in the pod. [*Id*. at 6]. Plaintiff described several other flooding events that occurred in May 2017, caused by other inmates. [*Id*. at 5-7]. Each of these incidents involved less than a half-inch of water, which remained in his cell; for less than a day. [*Id*.].

Plaintiff stated that he had suffered health problems from the flooding incidents, namely, he got "physically sick" for a few days after the April flooding. [*Id*. at 8-9]. Plaintiff stated that his stomach was cramping and hurting, and he began having problems with bowel movements. [*Id*. at 9]. His stomach problems only lasted for a day or two, and he saw the jail nurse when he was experiencing stomach problems. Plaintiff filed a medical request asking for samples of his stool to be tested for diseases, but instead, the nurse just spoke to him, asked him about the color of his stool, and gave him Imodium. Plaintiff also stated that he experienced mental and emotional problems after the April flooding, including difficulty sleeping. Further, Plaintiff stated that he experienced only mental and emotional injuries as a result of the remaining flooding incidents. [*Id*.].

In a separate declaration, Plaintiff stated that Captain Gentry was present with the inmate broke the phone kiosk on April 23, and said that the entire pod would be locked down for it. [Doc. 28-1 at 1]. He stated that, from every flooding, his bedsheets got contaminated, and it took nearly a month to receive clean sheets after the April flooding.

[*Id*.]. Plaintiff stated that the drains on the floor in the pod were clogged, which was why his cell always flooded. [*Id*. at 2]. He did not receive cleaning supplies, despite repeatedly requests, until May 3, 2017, when he told Captain Gentry that he was going to break his sprinkler if he did not receive cleaning supplies. [*Id*. at 2-3]. Plaintiff stated that Captain Gentry responded, about the cell, "it does smell like shit in here," before telling the guards to allow Plaintiff to have cleaning supplies. [*Id*. at 3]. However, the guards still refused to provide him with cleaning supplies after the other floods. [*Id*.]. Plaintiff stated that it was common practice at the Jail for the guards to use collective punishment by locking down the entire pod. [*Id*. at 3-4].

Disciplinary reports indicate that, before the incidents described in the complaint, inmate Pryor received disciplinary reports for setting off the sprinkler in his cell on March 15, 2017, and April 19, 2017. [Doc. 28-10 at 1-3, 9-10]. On April 25, 2017, an incident report indicated that the B-Unit was on lockdown for security risk and safety of personnel, when deputies witnessed inmate Pryor hit the sprinkler in his cell with his dinner tray. [*Id*. at 11]. Deputy Lawhorn called Captain Gentry to inform him of the situation. Thereafter, inmate Pryor began urinating on his cell door, then defecated in front of the door and smeared it onto the door window. Inmate Pryor was ultimately extracted from the cell. [*Id*.]. On May 3, 2017, a disciplinary report was written up regarding Plaintiff. [*Id*. at 12]. According to the report, Corrections Officer James McKelvey saw Plaintiff filling his shower tote with water, and, when he instructed Plaintiff to return to his cell, Plaintiff dumped the water in the floor. Officer McKelvey threatened to release K9 Yoshi if Plaintiff refused to comply, and, after taking a few steps towards his cell, Plaintiff stopped and stated

that he would not go in.  Plaintiff was apparently complaining that his phone call was cut off.  Plaintiff finally returned to his cell, but threatened to kill Officer McKelvey, K9 Yoshi and other corrections officers.  Once Plaintiff was secured, officers retrieved a wet vac to clean up the water.  [*Id.*].

On May 16, 2017, Plaintiff filed a medical request stating "[e]ver since prior flooded my cell with urine and feces [I] been having bowel problems and my stomach[] has been in extreme pain can not keep toilet paper.  Also [I] need a (Hep-C) test done."  [Doc. 28-11 at 1].  Handwritten notes from the nurse indicate that Plaintiff complained of cramping and bowel movements 3 to 4 times a day, as well as yellow-colored stool.  It is unclear what treatment Plaintiff received from the nurse's note.  [*Id.*].

## II.    STANDARD OF REVIEW

Defendant's motion is brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment.  Rule 56(a) provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion[.]"  Fed. R. Civ. P. 56(c)(1).  This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information.  Fed. R. Civ. P. 56(c)(1)(A).  Additionally, a party may "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Moreover, mere conclusory and unsupported allegations, rooted in speculation, are insufficient to meet this burden. *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

To defeat a motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id*. at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id*. at 251-52.

## III.   ANALYSIS

### a.  Statute of Limitations

Defendant asserts that Plaintiff's claim is barred by the statute of limitations. [Doc. 24 at 7]. Defendant argues that Plaintiff alleges that his cell flooded on April 23 and 24, 2017, but he did not file his complaint until April 25, 2018. Thus, Defendant contends, Plaintiff did not file his complaint within the applicable one-year statute of limitations. [*Id*.]. Plaintiff responds that Defendant never raised the statute of limitations as an affirmative defense. [Doc. 28 at 11]. Further, Plaintiff contends that his case alleges a

10

"continuing tort." Additionally, he argues that most of the notable events in his complaint happened on or after April 25. [*Id*.]. Specifically, he contends that the denial of cleaning materials and denial of clean bedsheets continued well past April 25, and even the actual wastewater flooding continued until April 26. [*Id*. at 12]. Plaintiff argues that forcing him to live in these conditions was wrongful conduct, which accrued continuously, and if the guards had, at any point, taken steps to clean up the water and disinfect the cell, further injury would have been avoided. [*Id*.].

"Federal district courts apply state statutes of limitations in proceedings brought under 42 U.S.C. § 1983." *Pendergrass v. Sullivan*, No. 1:19-cv-115, 2019 WL 4264377, at *2 (E.D. Tenn. Aug. 14, 2019) (quoting *Cooper v. Rhea Cnty., Tenn.*, 302 F.R.D. 195, 199 (E.D. Tenn. 2014)). Although § 1983 has no statute of limitations on its own, the applicable limitations period is the same period that "state law provides for personal injury torts, which is one year in Tennessee." *Id*. (citing Tenn. Code Ann. § 28-3-104).

Under the "discovery rule," a statute of limitations begins to run from the time when "a plaintiff discovers, or in the exercise of reasonable care and diligence, should have discovered, his injury and the cause thereof." *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 735 (Tenn. Ct. App. 1996) (citation omitted). Thus, in Tennessee, "a cause of action accrues and the statute of limitations begins to run not only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363

S.W.3d 436, 459 (Tenn. 2012) (internal quotation marks omitted); *see also Pero's Steak and Spaghetti House v. Lee*, 90 S.W.3d 614, 621 (Tenn. 2002).

The continuing violation doctrine is strictly construed, *see Austion v. City of Clarksville*, 244 F. App'x 639, 647 (6th Cir. 2007), and is rarely applied to § 1983 actions. *See Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003). Indeed, even within the § 1983 context, Courts have been reluctant to apply the doctrine outside of the context of Title VII. *Claybrooks v. Primus Auto. Fin. Serv., Inc.*, 363 F. Supp. 2d 969, 981 (M.D. Tenn. Jan. 18, 2005).

The Sixth Circuit previously held that the continuing violation doctrine may operate to toll a statute of limitations in two narrowly limited exceptions: (1) "where the plaintiff can show prior discriminatory activity that continues into the present, as opposed to prior discriminatory activity whose effects continue into the present;" and (2) "where the plaintiff can how a longstanding and demonstrable policy of discrimination." *Id*. at 980 (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003)). However, the Supreme Court later abrogated the first category, holding that the continuing violation doctrine does not permit recovery for discrete acts that occurred outside of the statutory limitations period. *Id*. at 981 (citing *AMTRACK v. Morgan*, 536 U.S. 101 (2002)). Notably, after the *AMTRACK* decision, the Sixth Circuit has held that corrections officers' actions of refusing medical care represent discrete unlawful acts (beyond unlawful inaction) that trigger the statute of limitations, meaning that the continuing violation doctrine does not apply, and only discrete acts occurring during the limitations period are

actionable. *Bruce v. Correctional Medical Services, Inc.*, 389 F. App'x 462, 466-67 (6th Cir. 2010).

The Court concludes that the continuing violation doctrine is not applicable to Plaintiff's claim. As in *Bruce*, each denial of Plaintiff's requests for cleaning supplies, clean bedsheets, or showers were discrete, allegedly unconstitutional, actions on the part of the corrections officers. Because Plaintiff's complaint involves a series of discrete acts, only those acts that occurred within the limitations period are actionable. Here, that means that only the events in Plaintiff's complaint that occurred on or after April 25, 2017, are timely. Accordingly, the Court concludes that any allegations in Plaintiff's complaint about actions that occurred prior to April 25, 2017, are time-barred, and dismissal of those allegations is appropriate on this ground. Nevertheless, for the sake of completeness, and because the record is unclear as to when each request was made and denied, the Court will address whether there is any genuine issue of material fact supporting Plaintiff's deliberate indifference claim.

### b. *Monell* Liability

Before the Court addresses the merits of Plaintiff's deliberate indifference claim, it is appropriate to address whether Plaintiff has established *Monell* liability for the alleged deliberate indifference, since the County is the only named defendant in this action. A municipality cannot be held liable under § 1983 based on a theory of *respondeat superior*. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403 (1997); *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 691 (1978). Rather, "it is when execution of a government's policy or custom . . . inflicts the injury that the

13

government as an entity is liable under § 1983." *Monell*, 436 U.S. at 694. A plaintiff must prove two elements to invoke municipal liability: "(1) that a constitutional violation occurred; and (2) that the [municipality] is responsible for that violation." *Graham v. Cnty. Of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004) (internal quotation marks omitted).

"A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). A municipal policy or custom cannot be shown by one instance of misconduct. *Thomas v. City of Chattanooga*, 398 F.3d 426, 432-33 (6th Cir. 2005).

Here, Plaintiff alleges that Defendant is liable under *Monell*, as best the Court can tell, based on the second, third, and fourth methods of establishing liability. [Doc. 1 at 6-7]. However, before addressing each of these methods of establishing liability, the Court must determine the illegal conduct alleged in the complaint.[3] Notably, the parties' briefs on summary judgment have strayed from those allegations explicitly alleged in the complaint. Within his claim for relief, Plaintiff defines the unconstitutional conduct as "forcing [him] to sit in a cell for multiple days filled with human wastewater, . . . prohibiting him from washing, and . . . prohibiting him from cleaning the cell[.]" [*Id.* at 6]. Accordingly, the Court finds that the allegedly unconstitutional actions on which

---

[3] Although a *pro se* Plaintiff's pleadings should be liberally construed, here, Plaintiff is represented by counsel, and therefore, not entitled to such liberal construction of his complaint.

Plaintiff seeks to base liability are the corrections officers actions of (1) not timely cleaning the floodwaters; (2) not timely allowing Plaintiff to shower; and (3) not timely providing Plaintiff with cleaning supplies.

### i. Ratification of Illegal Actions

In his complaint, Plaintiff alleges that Captain Gentry and Jail Administrator Pam Freeman were the "high-ranking officials" that ratified the allegedly unconstitutional actions of the corrections officers. [Doc. 1 at 6]. However, Plaintiff has presented no evidence whatsoever that Freeman knew about the flooding at all, nor less the alleged delay in cleaning up the water, allowing Plaintiff to shower, or providing Plaintiff with cleaning supplies. Instead, Plaintiff's arguments in his briefs, and his evidence, center on the allegation that Captain Gentry was aware of, and ratified, these actions. Accordingly, the Court finds that Plaintiff has flatly failed to meet his burden of establishing *Monell* liability on the grounds that Freeman ratified the actions.

As to Captain Gentry, he claims that he was not aware of anyone denying Plaintiff a shower or cleaning supplies and was not involved in any decision to deny cleaning supplies. [Doc. 23-1 at 4]. However, Plaintiff contends that the guards told him that Captain Gentry had ordered that cells not be opened, and showers not be allowed. [Doc. 23-2 at 4]. Plaintiff also states that Captain Gentry was the one who locked down the pod as a result of the phone incident, thereby causing Pryor to flood the cell. [Doc. 28-1 at 1]. Further, Plaintiff states that, on May 3, he told Captain Gentry that he would break the sprinkler in his cell if he did not receive cleaning supplies, and Captain Gentry agreed that Plaintiff's cell smelled and told the guards to provide cleaning supplies. [*Id.* at 3]. Finally,

15

the disciplinary records indicate that, on April 25, the corrections officers informed Captain Gentry that Pryor was hitting the sprinkler in his cell with his dinner tray. [Doc. 28-10 at 11].

None of this evidence indicates that Captain Gentry knew of, and ratified, the corrections officers' allegedly unconstitutional conduct of failing to timely clean the flooding, allow Plaintiff to shower, or provide Plaintiff with cleaning supplies. Instead, the evidence only supports the conclusions that Captain Gentry was made aware of the second flooding event involving inmate Pryor, and that, when Plaintiff asked Captain Gentry for cleaning supplies on May 3, Captain Gentry ordered that cleaning supplies be provided. To the extent that Plaintiff testified that he was informed that Captain Gentry gave the orders not to allow the inmates to shower, this evidence is mere hearsay, which is not admissible at the summary judgment stage. *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence . . . must be disregarded." (internal quotation marks omitted)); *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment."). Because Plaintiff has presented no admissible evidence supporting his claim that Captain Gentry ratified the corrections officers' alleged decisions to delay cleaning the flood, deny Plaintiff a shower, or deny Plaintiff cleaning supplies, he has not established that there is a genuine issue of material fact with regard to this method of establishing *Monell* liability.

16

## ii. Custom of Tolerance of Violations

Plaintiff's complaint alleges an "illegal custom" of refusing to punish inmates who threaten or harm others and a custom of using collective punishment, including the denial of showers and disabling of the water supply. [Doc. 1 at 6]. Initially, there is no factual allegation that corrections officers ever disabled the water supply in the incidents alleged by Plaintiff, therefore, Plaintiff's claim of a custom of disabling the water supply is entirely irrelevant to this matter.

As to Plaintiff's allegation of a custom of failing to punish inmates, this purported custom is also irrelevant to the alleged unconstitutional actions in this case, at least to the extent that it requires several leaps of logic to connect such an alleged custom to the unconstitutional acts alleged. Again, the alleged unconstitutional acts are failure to timely (1) clean up the flooding; (2) allow Plaintiff to shower; and (3) provide Plaintiff with cleaning supplies. Plaintiff appears to claim that the failure to punish inmates individually led Pryor to become upset, which then led Pryor to flood his cell. But the initial flooding is not alleged as an unconstitutional act, nor could it be, as the corrections officers had no control over Pryor's actions. Moreover, even if Plaintiff is alleging a custom of failing to punish inmates for flooding the pod, the evidence belies this assertions, as it shows that inmates, including both Pryor and Plaintiff, have received disciplinary write-ups for causing flooding in the pod.

The only remaining theory of a custom to support *Monell* liability is Plaintiff's allegation that Defendant had a custom of using the collective punishment of denying showers to all inmates. However, the record before the Court is entirely deplete of evidence

indicating that the Defendant had any such custom.  At most, the evidence before the Court could support a conclusion that Defendant had a custom of keeping inmates in their cells during flooding events, but the evidence also establishes that this policy is to protect inmates from flooding conditions, rather than to punish inmates.  Ultimately, based on the record presented, the Court simply cannot conclude that Defendant had any custom of punishing inmates by denying showers.

The Court pauses here to note that a significant portion of the evidence submitted by Plaintiff relates to complaints of mistreatment by other inmates at the Coffee County Jail.  Plaintiff apparently relies on this evidence in an attempt to establish a general custom of mistreatment of inmates.  However, such an alleged custom is far too broad to establish any *Monell* liability.  Notably, none of the grievances of the other inmates submitted relate at all to flooding, denial of showers, or denial of cleaning supplies.  Accordingly, the Court deems this evidence irrelevant to the matter at hand, and will not consider it.

In sum, the Court concludes that no genuine issue of material fact exists as to whether Defendant had a custom of tolerance of the violations alleged by Plaintiff.  Accordingly, Plaintiff cannot establish *Monell* liability on this ground.

### iii.  Inadequate Training

A plaintiff can establish that inadequate-training is the product of deliberate indifference "in one of two ways."  *Shadrick v. Hopkins County*, 805 F.3d 724, 738 (6th Cir. 2015).  He can plead sufficient facts showing (1) the municipality's officers engaged in a pattern of comparable constitutional violations or (2) "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees

18

to handle recurring situations presenting an obvious potential" for a violation. *Id.* at 738-39 (quoting *Bryan Cnty.*, 520 U.S. at 409). An allegation of a pattern of similar misconduct— the first of the two approaches—is the "ordinar[y]" or traditional way for a plaintiff to establish an inadequate-training theory. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). This is so because repetitive wrongdoing by officers who exercise their discretion is a sure sign that those officers require additional training, and it should be "plainly obvious to the city policymakers." *Bryan Cnty.*, 520 U.S. at 407 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).

But the Supreme Court has acknowledged "the possibility," "in a narrow range of circumstances," *Connick*, 563 U.S. at 63 (quoting *id.* at 409), that a municipal policy-maker's deliberate indifference "could" arise without a pattern of prior constitutional misconduct, *Bryan Cnty.*, 520 U.S. at 409. This is where the second of the two approaches has its application. The Supreme Court confined this second approach to cases in which there is a "likelihood that [a] situation will recur" with such a "high degree of predictability" that "an officer lacking specific tools to handle that situation will violate citizens' rights." *Id.* at 409-10. For "liability to attach in the instance of a single violation, the record must show a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Harvey v. Campbell County, Tenn.*, 453 F. App'x 557, 567 (6th Cir. 2011) (internal quotation marks omitted).

To the extent that Plaintiff's failure-to-train argument relies on a pattern of comparable violations, as the Court discussed previously, the other violations to which

Plaintiff points are not "comparable," in that they involve allegations of misconduct not related to flooding, providing cleaning supplies, or allowing showers. Rather, most of Plaintiff's evidence relates to uses-of-force which is not comparable to the allegations here. There is simply no evidence in the record of a pattern of misconduct relating to flooding, denying showers, or denying cleaning supplies. Because Plaintiff has not shown any pattern of *comparable* violations, he cannot maintain a failure-to-train claim on this basis.

Notably, Plaintiff does not explicitly assert the single incident theory, but the Court will nevertheless address that theory of establishing a failure-to-train claim. Even if the Court were to assume that the actions alleged by Plaintiff were constitutional violations, the record does not show a "complete failure to train the police force" or "training that is so reckless or grossly negligent that future police conduct is almost inevitable." Defendant has presented evidence that its corrections officers are trained on cleaning flood waters and maintaining sanitary conditions. On the other hand, Plaintiff has presented no evidence about the training received by Defendant's officers. Based on this record, the Court cannot conclude that a genuine issue of material fact exists as to Plaintiff's failure-to-train claim.

Because, for the reasons stated above, no genuine issue of material fact exists as to any of Plaintiff's asserted grounds for *Monell* liability, the Court concludes that summary judgment in favor of Defendant is appropriate.

### c. Deliberate Indifference

Although this matter is due to be dismissed because no genuine issue of material fact exists as to any of Plaintiff's asserted grounds for *Monell* liability, and Coffee County

is the only named defendant in this matter, the Court will nonetheless address an alternative ground for granting summary judgment and dismissing this case.

Defendant contends that Plaintiff cannot demonstrate that he suffered an injury that meets the PLRA's threshold, because the proof shows that Plaintiff had an upset stomach that was treated with over-the-counter medication and resolved in two days, which is a *de minimis* injury insufficient to support his claim. [Doc. 24 at 10-11]. Further, Plaintiff's allegation that he was exposed to a risk of Hepatitis C is insufficient, because such a risk has not been alleged to have resulted in actual physical harm. [*Id*. at 11]. Plaintiff responds that he has alleged physical injury sufficient under the PLRA. [Doc. 28 at 13]. He argues that he not only experienced emotional distress from the situation, but also became physically ill, which is supported by the medical records. [*Id*.]. Plaintiff further contends that unsanitary conditions can potentially satisfy the "physical injury" requirement even without any physical ailment, citing to *Brasswell v. Corrections Corporation of America*, 419 F. App'x 622 (6th Cir. 2011). [*Id*. at 14]. Defendant argues that *Brasswell* is distinguishable, because the plaintiff in that case was left in an "disgustingly unsanitary cell" for nine consecutive months without a shower or opportunity to exercise. [Doc. 29 at 13].

Under the Prison Litigation Reform Act ("PLRA"), "[n]o [f]ederal civil action may be brought by a prisoner . . . for mental or emotional injury suffered while in custody without a showing of physical injury or the commission of a sexual act[.]" 42 U.S.C. § 1997e(e). Under § 1997e(e), the physical injury need not be significant, but it must be

more than a *de minimis* injury for an Eighth Amendment claim to stand. *Flanory v. Bonn*, 604 F.3d 249, 254 (6th Cir. 2010).

One Court in this Circuit has concluded that a prisoner's claim of deliberate indifference, based on another inmate throwing human waste on him in the showers, did not meet the physical injury requirement of § 1997e(e), because the only alleged injury was fear of contracting HIV or hepatitis. *Anthony v. Werner*, No. 07-15138, 2008 WL 2447328, at *1, *6 (E.D. Mich. June 18, 2008). Moreover, this Court has previously held that "feeling sick" for two days is, at most, a *de minimis* injury, which is insufficient under the physical injury requirement of the PLRA. *Starnes v. Green Co. Sheriff's Office*, No. 2:08-cv-244, 2010 WL 2165368, at *3 (E.D. Tenn. May 25, 2010).

Here, Plaintiff does not even allege any physical injury stemming from any of the flooding incidents except the ongoing April flooding. Accordingly, any claims based on later flooding events simply cannot stand in light of the PLRA's requirement of a physical injury. As to the April flooding events, Plaintiff's only alleged physical injury was that he felt sick to his stomach for a few days after the flooding. However, as the Court previously held, "feeling sick" is, at most, a *de minimis* injury. The fact that Plaintiff's upset stomach either went away on its own, or with the help of over-the-counter medication, further supports that this alleged physical injury can be considered no more than *de minimis*. Because this physical injury is no more than a *de minimis* injury, there is no genuine issue of material fact as to whether Plaintiff has an actionable deliberate indifference claim.

*Braswell* does not undermine this conclusion. In that case, the Sixth Circuit concluded that the record did not support the conclusion that the plaintiff's injuries were

*de minimis*, pointing to evidence that the plaintiff was left in a "disgustingly unsanitary cell" for nine consecutive months without an opportunity to shower or exercise, while the cell had mold growing in the toilet, littered with food trays, and received no natural light. 419 F. App'x at 626-27. The Court thus concluded that "a claim that prisoner has languished in a filthy cell for nine consecutive months asserts more than a *de minimis* physical injury." *Id*. at 627. However, here, Plaintiff has alleged, at most, that he was left in an unsanitary cell for a few days. By Plaintiff's own admission, he was allowed to shower at the end of the day on April 25, two days after the first flooding incident and one day after the second incident. [Doc. 1 at 4]. Moreover, Plaintiff admits that after approximately 75 to 78 hours, he was allowed to clean his cell with a squeegee and a mop, and was ultimately provided with cleaning supplies on May 3, approximately ten days after the first flooding incident. [Doc. 23-2 at 5; Doc. 28-1 at 3]. Plaintiff's allegations of short-term deprivation of a shower and cleaning supplies simply do not rise to the level of the injury alleged in *Braswell*. Accordingly, the Court finds that no genuine issue of material fact exists as to whether Plaintiff has presented an actionable deliberate indifference claim under the PLRA, and Defendant is entitled to summary judgment.

## IV.    CONCLUSION

For the reasons stated herein, Defendant's motion for summary judgment [doc. 23] will be granted, and this case will be dismissed. An order consistent with this opinion will be entered.

s/ Leon Jordan
United States District Judge